**AMERICAN TRUCKING ASSOCIA-TIONS, Inc., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

Rock Island Motor Transit Company, New York Central Transport Company, Intervenors.

Civ. A. No. 835–64.

United States District Court
District of Columbia.

Oct. 10, 1966.

Peter T. Beardsley, Richard A. Mehley, and Harry J. Jordan, Washington, D. C., for plaintiff.

Leonard S. Goodman, Asst. Gen. Counsel, and Robert W. Ginnane, Gen. Counsel, I. C. C., for defendant, I. C. C.

Thomas I. Megan, Theodore E. Desch, Martin L. Cassell and George M. Mariner, Chicago, Ill., and Walter J. Myskowski, Washington, D. C., for intervening defendant, Rock Island Motor Transit Co.

Joseph Rotwein, Washington, D. C., and Herbert Burstein, New York City, for intervening defendant, New York Central Transport Co.

Before WILBUR K. MILLER, Senior Circuit Judge, and KEECH and MATTHEWS, District Judges.

WILBUR K. MILLER, Senior Circuit Judge.

Several years ago Eastman Kodak Company decided to move its midwestern sales and distribution facilities from Chicago to a new plant it planned to erect at Oakbrook, Illinois, about two and one-half miles west of the Chicago commercial zone. Desiring to retain the services of the trucking companies which had served its Chicago facilities, Eastman requested the 30 companies involved to apply to the Interstate Commerce Commis-

sion for authority to serve the Oakbrook installation. All did so—28 independent trucking companies and two companies wholly owned by railroads.[1] No applicant opposed the application of any other, but the plaintiff, American Trucking Associations, Inc., opposed the applications of the railroad affiliates, and was the only real protestant. At a consolidated hearing before a trial examiner in 1961, Eastman produced witnesses who testified in support of all 30 applicants. The plaintiff presented no evidence.

Twenty-seven of the 28 independent applicants were certificated by the Commission. On June 25, 1965, after prolonged proceedings upon which we think it unnecessary to elaborate, a division of the Interstate Commerce Commission issued a certificate of convenience and necessity authorizing Motor Transit to serve the Oakbrook installation, and held that Transport already had the authority it sought, by virtue of the fact that Oakbrook, though not a rail point, is described in a New York Central tariff as being within the Chicago terminal area of that railroad.

Thereupon the American Trucking Associations, Inc., by amending its complaint theretofore filed, asked the Court to annul, set aside and permanently suspend and enjoin the reports and orders of the Interstate Commerce Commission which certificated Motor Transit and held Transport already had the authority it sought.[2] The two railroad-owned motor carriers were permitted to intervene.

At the outset it should be noted that judicial review of these orders is extremely limited. The Supreme Court has said that

" * * * the [Federal Power] Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert

---

1. Rock Island Motor Transit, a subsidiary of the Chicago, Rock Island & Pacific Railroad Company, and New York Central Transport, a subsidiary of the New York Central Railroad Company.

2. That the plaintiff lacked standing to bring this suit was persuasively argued by the

Commission. If the question were open, we should be inclined to hold that ATA lacked standing; but the Supreme Court has ruled otherwise. American Trucking Assns. v. United States, 355 U.S. 141, 144, 78 S.Ct. 165, 2 L.Ed.2d 158 (1957).

judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. * * * 3

This excerpt from the *Hope* opinion was repeated in Interstate Commerce Comm. v. City of Jersey City, 322 U.S. 503, 512–513, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944). The *Jersey City* opinion also quoted the following from the *Rochester Telephone* case: 4

" * * * So long as there is warrant in the record for the judgment of the expert body it must stand. * * * 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' * * * "

■ Accordingly, our function is to ascertain whether the Commission has correctly applied the law and, if so, whether its findings sufficiently indicate the bases for the conclusions reached, and whether the evidence contains substantial support for the findings. Those are the limits of our power of review.

*Rock Island Motor Transit Company*. Prior to this proceeding, Motor Transit was operating an unrestricted service authorized by the Commission from Chicago to many points in the Midwest and was moving Eastman's shipments from the latter's Chicago facility to the numerous places to which it made deliveries. It sought authority to serve the new Oakbrook plant as an off-route point in connection with its regular-route operations to and from Chicago, already authorized.

The basic statutory authority of the Interstate Commerce Commission to grant certificates of public convenience and necessity to motor carriers is found in § 207(a) 5 of the Interstate Commerce Act, 49 U.S.C. § 307(a), 49 Stat. 551. Section 5(2) (b) 6 of the Act, 49 U.S.C. § 5(2) (b), 54 Stat. 906, having to do with acquisitions and mergers, imposes restrictions on the grant of authority to a motor carrier which is controlled by or affiliated with a railroad. The Commission has interpreted this statute as confining acquisition of a motor carrier by a railroad or its affiliate to "opera-

3. Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).

4. Rochester Telephone Corp. v. United States, 307 U.S. 125, 145–146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).

5. "Sec. 207. (a) Subject to section 210, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this part and the requirement, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied * * * "

6. "Sec. 5(2) (b) " * * * If the Commission finds that, subject to such terms

and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: *Provided*, That if a carrier by railroad subject to this part, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6) of this section, is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

tions * * * which are auxiliary or supplementary to train service." [7]

In American Trucking Assns. v. United States, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed. 2d 158 (1957), the Supreme Court pointed out that § 207(a) does not contain the restrictive language of § 5(2) (b) and that there is no language in § 207(a) "even suggesting a mandatory limitation to service which is auxiliary or supplementary." Later in the opinion the Court said, at pages 149–150, 78 S.Ct. at pages 170–171:

"In interpreting § 207, the Commission has accepted the policy of § 5(2) (b) as a guiding light, not as a rigid limitation. While it has applied auxiliary and supplementary restrictions in many § 207 proceedings, the Commission has occasionally issued certificates to railroad subsidiaries without the restrictions where 'special circumstances' prevail, namely, where unrestricted operations by the rail-owned carrier are found on specific facts and circumstances to be in the public interest. * * *

"We conclude, therefore, that the Congress did not intend the rigid requirement of § 5(2) (b) to be considered as a limitation on certificates issued under § 207."

■ Thus the Commission had authority to grant Motor Transit's application to serve the Oakbrook plant regardless of § 5(2) (b) if it correctly found "special circumstances" negating any possible disadvantage to the public from the grant to a railroad-owned carrier. The plaintiff contends there were no "special circumstances" shown and that, therefore, the certification of Motor Transit was erroneous. Whether so or not is the question with respect to that company.[8]

■ In discussing the special circumstances question, the Commission said:

"* * * Motor Transit has been serving Eastman's Chicago plant and is merely seeking to continue to provide Eastman with the same service to the same points from the new facilities at Oakbrook. It is not seeking to provide a new service in the terms discussed in the Pennsylvania case [Pennsylvania Truck Lines, Inc. v. United States, 219 F.Supp. 871 (W.D.Pa. 1963)] nor will its proposed service inject a new quantum of competition detrimental to those independent motor carriers which also have been serving Eastman's Chicago plant and which do not oppose the issuance of authority to Motor Transit. In this connection, it is of real significance in a proceeding such as this that the application is not opposed by competing motor carriers but only by ATA which presented no evidence as to the services which competitive motor carriers are ready, willing, and able to provide. * * * And we may not infer injury to competing carriers in the absence of evidence indicating that present trans-

7. American Trucking Assns. v. United States, 355 U.S. 141, 148 and footnote 8 on p. 148, 78 S.Ct. 165, on p. 169 (1957).

8. The ATA, seriously and at considerable length, also argues that "Motor Transit failed even to meet the burden of proof required of ordinary motor carriers." We are not impressed by that contention because we note that the application of Motor Transit was consolidated with those of 28 ordinary motor carriers as well as with that of New York Central Transport, and that the 30 applications were heard together.

Evidence in support of the 30 applications was presented only by Eastman and the same in all instances. Thus, the ap-

plication of Motor Transit was supported by the same proof pursuant to which 27 ordinary motor carriers were certificated. Yet ATA did not attack the certificates of the latter as having been granted on insufficient proof. So, in arguing that "Motor Transit failed even to meet the burden of proof required of ordinary motor carriers," the ATA is, in effect, arguing that the 27 ordinary motor carriers were improvidently certificated, although it did not oppose them. In making the invalid argument under discussion, ATA seems to have been motivated by the fact that Motor Transit is a railroad affiliate.

portation facilities can and are willing to meet the shipper's need for service.

"Thus, the facts of the matter are that: (1) Eastman has indicated a need for a continuation of the service of Motor Transit from Oakbrook to the points Motor Transit has served from Chicago, (2) no motor carrier holding competitive authority opposes the application and there is no indication that any motor carrier is able or willing to serve those points which Motor Transit is authorized to serve and has been serving in the past, and (3) a denial of the application would clearly deprive the shipper of a transportation service which it has enjoyed in the past and which it needs in order to utilize effectively and economically its new Oakbrook facility. * * * "

The Commission also pointed out that Motor Transit's existing authority is free of the usual restrictions imposed on motor carrier operating rights issued to rail affiliates and that "the instant application is but a slight extension" of the authority. We hold that the Commission correctly concluded that special circumstances exist which amply justified the grant of Motor Transit's application.

■ *New York Central Transport Company.* This motor carrier sought a certificate to serve Eastman's Oakbrook plant from Chicago, although that operation would be subsequent to a rail movement to Chicago from the shipper's Rochester facilities. The Commission held that such a certificate was unnecessary as New York Central Transport already had, under its rail parent's authority, the right to make deliveries from Chicago to Oakbrook because Oakbrook, though not a rail point, is properly described in a tariff of the New York Central Railroad as being within the railroad company's Chicago terminal area.

Distilled to its essence, ATA's position seems to be that Oakbrook is not properly described as being within New York Central's Chicago terminal area. We have noted that Oakbrook is only two and one-half miles beyond the Chicago commercial zone, and we think it apparent, therefore, that Oakbrook, being described in a New York Central tariff, is within that railroad's homogeneous terminal area at Chicago.

■ ATA argues that if a railroad can extend its terminal area two and one-half miles beyond the commercial zone of its terminal city by the simple expedient of publishing a tariff for that point, it could by the same expedient extend its terminal area somewhat indefinitely. The argument is invalid because any terminal area description is subject to investigation and suspension by the Commission and may be attacked by the complaint of any interested party. Long ago, in Palisano Common Carrier Application, 41 M.C.C. 229, 232 (1942), the Commission said:

"Terminal areas must, of course, be limited to areas in which the motor-vehicle transportation consists of genuine transfer, collection, or delivery service as distinguished from line-haul transportation. Where the terminal areas of the rail carriers, motor carriers, express companies, water carriers, and freight forwarders extend beyond the corporate limits of a village, town, or city, such 'terminal areas' should be defined in their tariffs. Such descriptions of terminal areas are subject to suspension and investigation by this Commission and may be attacked upon complaint of any interested party."

■ There is no authoritative definition of a terminal area. It is necessary that any question concerning the propriety of any such area be determined upon the facts of the particular case presented.

We are clearly of the opinion that Oakbrook was properly held by the Commission to be within New York Central's Chicago terminal area. We hold therefore that the Commission was correct in concluding that Transport did not need a certificate for its operations between Chicago and Oakbrook.

Affirmed.