**NORTHERN FREIGHT LINES, INC., et al., Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**and**

**Railway Express Agency, Inc., Intervenor-Defendant,**

**and**

**The National Small Shipments Traffic Conference, Inc.; the Drug and Toilet Preparation Traffic Conference; the Eastern Industrial Traffic League; the American Home Products Corp.; the Norwich Pharmacal Co., and Sterling Drugs, Inc., Intervenors.**

**Civ. A. No. 12699.**

United States District Court
N. D. Georgia,
Atlanta Division.

Sept. 8, 1969.

Guy H. Postell, Frank D. Hall, Atlanta, Ga., Peter T. Beardsley, R. Edwin Brady, Albert B. Rosenbaum, Washington, D. C., Donald E. Cross, Bryce Rea, Jr., Washington, D. C., for plaintiffs.

Robert A. Hammond, III, Acting Asst. Atty. Gen., John D. Wigger, Atty., Dept. of Justice, Washington, D. C., John W. Stokes, U. S. Atty., Atlanta, Ga., for the United States.

Robert W. Ginnane, Gen. Counsel, Raymond M. Zimmet, Atty., ICC, Eugene T. Liipfert, William O. Turney, David A. Sutherland, Washington, D. C., David Axelrod, Chicago, Ill., Roland Rice, John S. Fessenden, Richard R. Sigmon, Washington, D. C., for ICC.

John E. Robson, Elroy H. Wolff, Leibman, Williams, Bennett, Baird & Minow, Washington, D. C., Robert C. Boozer, Sanders, Hester, Holley, Ashmore & Boozer, Atlanta, Ga., Arthur M. Wisehart, William H. Marx, New York City, of counsel, for REA.

John J. C. Martin, New York City, Robert C. Boozer, Sanders, Hester, Holley, Ashmore & Boozer, Atlanta, Ga., for remaining intervenors.

Before BELL, Circuit Judge, and EDENFIELD and HOOPER, District Judges.

EDENFIELD, District Judge:

The issue before this three-judge district court, constituted under 28 U.S.C. §§ 1336, 2284, 2321–2325, is whether the Interstate Commerce Commission acted within its discretion in concluding that Railway Express Agency should remain outside the terminal area[1] limits for motor carriers, set under Part II of the Interstate Commerce Act.

A brief chronology will help establish the posture in which we find this action. Railroads have long been charged by the courts with the duty of making their railroad facilities available to the public, although not to every express agency, for the transportation of express matter.

---

[1]. The "terminal area" is the territory within which bona fide transfer, collection, and delivery services, as distinguished from line-haul or intercity service, may be performed. Palisano Common Carrier Application, 41 M.C.C. 229, 232.

Express Cases, 117 U.S. 1, 24, 28, 6 S.Ct. 542, 29 L.Ed. 791 (1886). Along with passage of the 1887 Act to Regulate Commerce the ICC recognized that the railroads had a primary duty to furnish express service. To relieve themselves of this duty the railroads often contracted out for their small parcel, express traffic to independent express companies. These independent companies were brought within ICC jurisdiction in 1906, when the definition of common carrier in § 1(3) (a) of the Interstate Commerce Act was amended to include express firms. In 1929, the nation's railroads established Railway Express Agency as their exclusive agent to conduct express service. They continue to this day to be its owners.[2] REA operated motor vehicle collection and delivery operations as part of its terminal area service and generally relied upon passenger trains for the line-haul movement of its express commodities. Improved highways and a severe attrition in railroad passenger service in recent years has led to greater reliance on motor vehicles, often its own, for the line-haul movement of express shipments. In order to engage in line-haul shipments with its own trucks, REA must obtain motor carrier certificates under Part II of the Interstate Commerce Act. But, while "[g]reater reliance on motor vehicles for line-haul movements has reduced the amount of express traffic moving by rail, * * * this continues to be the principal mode used." Express Company Terminal Areas, 332 I.C. C. 91, 100 (Ex Parte No. 242, 1967).

Along with increased reliance on motor vehicles for line-haul movement, other significant changes have occurred in REA's modus operandi. "REA has in recent years shown great interest in obtaining, and has actively solicited, large shipments of various commodities to produce what is termed a better 'mix' with the smaller shipments traditionally handled." *Express Company Terminal Areas*, supra, at 100–101. These large

volume shipments have often thrown REA into competition with independent motor carriers and freight forwarders. REA also instituted a "key-point terminal" program designed to reduce the number of smaller offices through consolidation into large and more efficient terminals. These consolidated terminals, capable of processing large volumes of traffic, have been situated, for purposes of efficiency, in locations central to their service areas, rather than tied to specific base municipalities. REA's consolidation program has produced a "concomitant enlargement of the terminal areas served by existing offices", *Ibid*, at 99, thus increasing the size of the area within which REA performs its pickup and delivery services.

The increasing size of REA's terminal areas has aggravated, from the plaintiffs' viewpoint, the distinction long recognized between express terminal areas and terminal areas for motor carriers. Due to the acknowledged differences between pure express service, governed under Part I of the Interstate Commerce Act, and regular motor carrier service, regulated under Part II of the Act, REA has been permitted to employ an entirely different system for defining its terminal areas than that used by motor carriers. There is no specific statutory provision conferring terminal areas upon line-haul motor carriers under Part II. Rather, the authority of motor carriers to provide pickup and delivery service in a defined terminal area is given incidental to their line-haul authority. Motor carrier terminal areas for transfer, pickup and delivery, are determined by Commercial Zones and Terminal Areas (Ex Parte No. MC–37), 54 M.C.C. 21 (hereinafter cited as MC–37). REA terminal areas have not, in the past, been governed by MC–37 limits, which are generally tied to specific commercial zones and base municipalities. Although REA must often secure motor carrier certificates under Part II, for line-haul

---

2. The United States, in its brief, at 5, n. 2, notes that the railroads have agreed to sell their stock interest to unaffiliated persons, citing the Wall Street Journal, July 9, 1969, at 8, col. 1–2, July 10, 1969, at 3, col. 5–6.

movement of express shipments, just as regular motor freight carriers, it has not felt itself bound by the more restrictive terminal areas of MC–37. REA claims exemption from motor carrier terminal area limits, even as to its line-haul motor carrier operations, because of its status as an express service under Part I. Thus, the ICC has allowed REA to set its own terminal areas merely by publication of its regular tariffs, ICCA–3 and ICCA–4. On one day's notice, REA is permitted to change and expand its terminal areas, solely at the discretion of its management. Motor carriers under Part II must undergo more complex and restrictive procedures to alter their terminal areas. REA terminal areas are, however, subject to regulation by the ICC through investigation and suspension procedures, and by complaints before it under section 13 of the Act, 49 U.S.C. § 13(1).

The result of REA's consolidation program and its considerable discretion in setting pickup and delivery areas has been the extension of REA terminal areas beyond the MC–37 commercial zones at some 750 REA offices [3] servicing 2771 points with a population of some 16 million people. Approximately one-half of these offices confine their terminal area services to areas extending less than ten miles beyond the MC–37 zones, "but some of the remainder serve points as far away as 50 miles. More specifically, 180 offices provide service to points ten to 20 miles distant from the MC–37 terminal area, 73 to points within 30 miles thereof, and the remaining 23 to points between 30 and 50 miles away." *Express Company Terminal Areas,* supra, at 100.

The ICC discussed the significant problems raised by REA's terminal areas and growing motor vehicle operations, in Railway Express Agency, Inc., Extension—Nashua, N. H., 91 M.C.C. 311 (1962) (hereinafter cited as *Nashua*), a

case in which REA sought several applications to operate as a common carrier by motor vehicle of general commodities moving in express service. The ICC tentatively decided that express business was subject to regulation under Part II of the Act, and stated that cases such as American Highway Freight Ass'n., Inc. v. Railway Express Agency, Inc., 201 I.C.C. 755, and Railway Express Agency, Inc. Determination of Status, 21 M.C.C. 161, 187–189, demonstrated that express companies were subject to Part I regulation—and thus to different economic regulation than motor carriers—only as to those express services associated with line-haul movements by rail. Terminal areas had to be defined as for other motor carriers under Part II, when the line-haul movement was by motor vehicle. As the ICC put it:

> "In other words, when REA uses the services of a certified independent motor carrier, or even when it operates over its own certified highway routes, it is bound by all limitations inherent in such operating authority, including any which limit the performance of pickup and delivery service to a specifically defined motor carrier terminal area." *Nashua,* supra, at 338.

While the *Nashua* conclusion was often reiterated, Railway Express Agency, Inc., Extension—Clinton, 92 M.C.C. 487; Railway Express Agency, Inc., Extension—Auburn, Mass., 92 M.C.C. 657, 658–659; Railway Express Agency, Inc., Extension—Bangor, Maine, 98 M.C.C. 75, 78, the ICC was clearly disturbed by the differences in terminal areas which would result solely from the mode of line-haul movement employed. This anxiety led the ICC to conclude that a rule-making procedure was necessary for purposes of uniformity:

> "We do think, however, that with the fact of REA's decreasing utilization of passenger trains, and its increasing

---

3. REA had 8320 offices, of which 3200 provided pickup and delivery service, at the time of the ICC ruling in late 1967. These figures, as well as the 750 points

mentioned above which exceed MC–37 zones, may have changed somewhat since the ICC ruling.

reliance on line-haul motor transportation, this state of the law [different terminal area regulation depending on the mode of line-haul movement for express shipments] is apt to foster unnecessary legal complications in what should be a relatively simple carrier-shipper relationship. Unless the effect and applicability of various provisions of the law are coordinated, it would seem that the maximum pickup and delivery zones at a given community incident to a line-haul shipment by a common carrier by express, such as REA, would vary depending upon whether the transportation has been by means of rail or motor vehicle. *We do not view this as a tolerable situation, and we will take the necessary steps to remove this probable uncertainty.* At this time, we conclude that it would be in the public interest to institute a specific proceeding with the purpose of defining the terminal area of an express company as that type of carrier is regulated by the Interstate Commerce Act as a whole." *Nashua,* supra, at 338. (Emphasis added.)

In light of *Nashua,* the ICC on its own motion[4] instituted a rule-making proceeding under 49 U.S.C. §§ 1, 12(1), 302(c) (2), 303(a) (14), 304 and section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, at which hearings were held. The Hearing Examiner concluded that REA's common carrier operations by motor vehicle subjected REA to MC–37 zones under Part II. To avoid distinct treatment for REA's line-haul rail movements, the Examiner concluded that MC–37 terminal area limits should

apply to REA regardless of its mode of line-haul movement—whether by rail or motor vehicle. He based this holding, among other things, on the finding that REA's conduct of motor carrier operations beyond MC–37 commercial zones constituted the performance of line-haul, rather than express, movement, and on the conclusion that REA was establishing its terminal areas for assembly and distribution purposes, rather than for bona fide collection and delivery service.

The ICC, with three dissents and three not participating, reversed the Examiner's recommended decision and concluded that REA, because of its unique express service, should remain subject to the same terminal area limits it had before, rather than be regulated by the MC–37 limits set for motor carriers. The ICC thus maintained the status quo. The ICC concluded that regardless of whether REA's express terminal area operations in conjunction with line-haul motor movements fell within Part I or Part II of the Act, REA should remain outside the MC–37 limits. As the ICC explained:

"Having found express service to constitute a distinct mode of transportation separate from the underlying modes it may utilize * * * we conclude that we possess sufficient authority under the act to allow the setting of express terminal areas which may differ from those of motor carriers and freight forwarders. * * *

"We are content, therefore, to rest our conclusions here on the legitimate exercise of the statutory authority vested in us by the act in the light of

4. By its order served April 13, 1964, the ICC stated that its rule-making proceedings would inquire into "the legal and operational practices, and the manner and methods of operation associated with transportation by motor vehicle, in interstate or foreign commerce, in the performance of transfer, collection, delivery, and all similar and related types of services and practices, within what are described or otherwise known as terminal, pickup, or delivery areas of, or for, express companies under Part I or Part II

of the Act, with a view to prescribing such rules and regulations as may be appropriate, or taking such other action as may be necessary or desirable in the light of the national transportation policy and the purposes of the Interstate Commerce Act as a whole, to resolve and define the operational practices, scope, and legal principles which do or should obtain in the performance of the terminal area services and related activities described."

the national transportation policy. Our conclusions would not differ whether or not respondents' express terminal area motor operations in connection with line-haul motor movements fall within the affirmative definition of a common carrier by motor vehicle in section 230(a)(14) of the act rather than within the exception thereto, so as to make them subject to regulation under part II rather than under part I of the act." *Express Company Terminal Areas*, supra, at 110–111.

■ In this action, we have a limited scope of review of the ICC's rule-making decision.[5] The specific statutes under which the ICC's rule-making was undertaken, 49 U.S.C. §§ 1, 12(1), 302(c) (2), 303(a) (14), 304, do not require that the rules promulgated "be made on the record after opportunity for an agency hearing", 5 U.S.C. § 553(c). Therefore, §§ 556, 557 do not come into force and the scope of review for adjudicatory proceedings under 5 U.S.C. § 706(2) (E) is inapplicable. Bridgeport Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, 199 F.Supp. 410 (E.D.Pa. 1961), aff'd., 307 F.2d 580 (3d Cir. 1962), cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499; George A. Rheman Co. v. United States, 133 F.Supp. 668 (E.D.S.C.1955). The fact that an oral hearing was held does not change the rule-making procedure into an adjudicatory one, for purposes of judicial review. American Trucking Ass'ns v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Unless we find the ICC acted in an arbitrary and capricious manner, in abuse of its discretion or otherwise out of accordance with the law, the ICC's rule-making decision must be supported. Tidewater Express Lines, Inc. v. United States, 281 F.Supp. 995

(D.Md.1968). Thus, the ICC must be upheld if there is a rational basis for its judgment. While this standard of review does not give the ICC carte blanche, Saginaw Transfer Co. v. United States, 275 F.Supp. 585 (E.D.Mich.1967), it recognizes the ICC's expertise in a rule-making proceeding involving complex issues of transportation policy. United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945).

With this standard of review in mind, we affirm the decision of the ICC. First, at the oral hearing, plaintiffs' counsel conceded that the central point of dispute was the extent to which REA had completed a transition from an express carrier to a regular motor carrier of general commodities. In questions of degree, the judgment of the ICC should be respected. Second, there can be no doubt that REA service and ordinary freight service have become somewhat more alike in recent years. Indeed, "the distinction between the two types of services has been blurred to some extent." Freight, All Kinds, L.C.L. Container Charges—U.S.A., 323 I.C.C. 468, 483. To attract the large shipments of commodities traditionally carried by motor carriers, REA has filed aggregate, unit, and volume rates, its revenue per shipment has risen from $5 to $6 over a ten-year period, and the average weight of its shipments since 1959 has increased from 45 to 51 pounds. A number of motor carriers have a genuine interest in handling less-than-truckload freight which REA has specialized in over the years. "[I]n some instances a significant percentage of a particular carrier's gross revenue is attributable to such traffic." *Express Company Terminal Areas*, supra, at 102. Yet, despite the similarities, it was not arbitrary for the ICC to find that REA offered a distinctive service, unmatched by common car-

5. The ICC's procedures were instituted pursuant to the rule-making provision of the Administrative Procedure Act, 5 U.S.C. § 553, its order commencing proceedings was styled as a rule-making exercise, and the purpose of the undertaking, see note 4, supra, is within the commonly accepted meaning of rule-making. *See, e. g.,* Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676 (9th Cir. 1949), cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527.

riers, entitling it to different terminal area treatment.

Traditionally, express service has been recognized for its special, expedited handling and transportation of comparatively small shipments at premium rates, with store-door delivery and single-line responsibility. *Nashua*, supra, at 322; Freight, All Kinds, L.C.L. Container Charges—U.S.A., supra, at 489 (concurrence). REA's activities meet the criteria of an express service established in the leading case of Transportation Activities of Arrowhead Freight Lines, 63 M. C.C. 573, 581–582; *see, also*, Freight, All Kinds, L.C.L. Container Charges—U.S. A., supra, at 479–480; *Express Company Terminal Areas*, supra, at 103. REA, unlike motor carriers of general commodities, holds itself out to transport all commodities in any form tendered, including items, "such as foodstuffs, seafood, fresh meats, drugs and medicines, film, legal papers, jewelry and other valuables, live animals, baby chicks, radioactive material, corpses, live blood, eggs, explosives, commodities which are injurious or contaminating to other lading, and commodities requiring special care and protection." *Nashua*, supra, at 315. Moreover, REA "provides armed guard and surveillance services when required," *Ibid.* Plaintiffs make no contention that they carry, as a general practice, such a wide-ranging group of materials. REA service is also distinctive for its emphasis on small parcel traffic. While, as we have shown, REA also seeks large shipments and motor carriers are increasingly relying upon less-than-carload shipments, there still appears to be a significant difference in emphasis given by the respective services to small shipments. The average weight per shipment for REA—51 pounds—is much less than the comparable weight for motor carriers —who, in addition, often impose minimum weight requirements. *Express Company Terminal Areas*, supra, at 102. REA's expeditious handling, single-line carriage, and premium rates have not been seriously challenged.

The ICC could reasonably find that REA did not lose its characteristics as an express carrrier merely because it actively seeks large-package shipments. Freight, All Kinds, L.C.L. Container Charges—U.S.A., supra, at 480, or otherwise performs certain functions tradiionally undertaken by motor carriers. *Cf.* American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). At some point in time, REA's activities may become indistinguishable from those of ordinary motor carriers, thus subjecting REA to identical economic regulation. But the ICC could rationally conclude that this point has not yet been reached.

Third, "[e]xpress service is a relative concept that has its roots in the circumstantial need by the shipping public for a special transportation service." *Nashua*, supra, at 324. REA continues to meet the special needs of shippers to an extent not matched on a regular basis by other motor carriers. By recognizing the unique service REA continues to make available the ICC has protected the shipping public. The record is replete with evidence of shipper dependence on REA service. This public dependence is based on many factors: REA's delivery service (Exhibit 12, at 2; Exhibit 15, at 3); its single carrier nationwide coverage (*see, e. g.*, Exhibit 13, at 4); the simplicity of its rate structure for small shipments (*see, e. g.*, Exhibit 19, at 7); its ability to handle items, often at no extra charge, which necessitate peculiar protective services (*see, e. g.*, the case of Pepto Bismol, Exhibit 13, at 4); its expedited handling of small shipments of the minimum charge category, a service "not readily available elsewhere" (Exhibit 16, at 3); its flexibility in modifying terminal areas to meet industrial relocation in suburban and outlying areas outside MC–37 zones and beyond previously established express areas (Exhibit 21, at 4); its dependable willingness to take items of high value, danger, or perishability (Exhibit 13, at 4; Exhibit 11, at 3; Exhibit 49, at 3). Plaintiffs

have adduced no evidence that they are willing and able on a regular basis to provide comparable service. While motor carriers are seeking out less-than-carload shipments, their high minimum charges, their inability to supply single-line service, and their failure to regularly provide protective services preclude a finding, contrary to that made by the ICC, that REA's express service is non-distinctive and nonessential to the public. (*See,* Exhibit 12, at 5; Exhibit 13, at 4, 7–8; Exhibit 16, at 3; Exhibit 19, at 8; Exhibit 20, at 1–3.) Moreover, the ICC could properly consider the potential impairment to shippers if areas outside MC–37 zones, now served by REA, were precluded from such service. American Trucking Ass'ns v. United States, 326 U.S. 77, 86, 65 S.Ct. 1499, 89 L.Ed. 2065 (1945). For example, the Department of Defense, a significant user of express service, maintains some "200 of the military installations under consideration in this proceeding which presently receive express pickup and delivery service * * beyond presently denominated MC–37 terminal areas." *Express Company Terminal Areas,* supra, at 101. Many of the shippers which have intervened in these proceedings, and doubtless other shippers as well, either ship or receive significant volumes of commodities "destined for delivery beyond the present MC–37 terminal areas." *Ibid,* MC–37. (*See, e. g.,* Exhibit 12, at 3; Exhibit 13, at 9; Exhibit 15, at 3; Exhibit 16, at 4; Exhibit 19, at 4.) We do not say that subjection of REA to MC–37 zones would create a void in service which could never be filled. However, we do think that the ICC could recognize the potential unsettling effect of a restriction in REA terminal areas on those currently served by REA, based on its expert knowledge of transportation patterns in the United States, and the strong statements of the intervening shippers.

Fourth, plaintiffs do not seem to question that REA could properly operate outside MC–37 zones if the underlying mode of its line-haul movement was by rail—as much of it still is. We can conceive of no reason for different treatment simply because the curtailment of rail passenger service has led REA to greater dependence on motor vehicles. Auclair Transportation, Inc. v. United States, 221 F.Supp. 328 (D.Mass.1963), aff'd per curiam, 376 U.S. 514, 84 S.Ct. 966, 11 L.Ed.2d 968 (1964). No segment of the shipping public should be deprived of REA's express services, simply because of a changing mode of interline movement. This partial dependence on motor carriers does not convert REA ipso facto into a nationwide freight operator, subject to all the regulations of ordinary motor vehicles. *Ibid;* cf. Estes Express Lines v. United States, 292 F.Supp. 842 (E.D.Va.1968). The ICC did not act arbitrarily in treating REA's motor operations, in effect, as an integral part of its express service.

Had the ICC accepted the plaintiffs' argument that REA terminal area services should be restricted when the line-haul movement for its express services was conducted by its own motor vehicles, it would have been faced with the very situation from which it pulled back in *Nashua,* supra: different pickup and delivery zones at a given community for express shipments depending upon the mode of line-haul movement to be used. 91 M.C. C. at 338. It is reasonable to expect that this would cause administrative havoc at REA, since shipments would have to be treated differently due to the mode of intercity transportation subsequently employed. Expedited handling might suffer if REA terminal areas were curtailed, due to the need to shift to non-REA transportation during some part of the journey, while also undercutting the single-line responsibility which has helped make REA express service attractive. The shipper is the person protected by the ICC ruling and by this court today, for he cares little about the mode of intercity transportation employed; he is concerned only with the express service REA furnishes. *See, Express Company Terminal Areas,* supra, at 107. "The choice is the shipper's; if he chooses to have his property move in an

expedited fashion he is, in fact, using an express service. It is clearly in the public interest that, if at all possible, this choice not be precluded."
*Nashua*, supra, at 340.

Fifth, we cannot accept plaintiffs' argument that the ICC acted in an arbitrary fashion by failing to consider evidence of competition between REA and general freight motor carriers. Plaintiffs state that since the ICC bottomed their rule-making decision on the distinctiveness of REA's express service, it was error to fail to consider the competition which goes to the heart of the issue of uniqueness. The ICC recognized that "some motor carriers and freight forwarders may be affected by competition from REA generally, and particularly when this carrier may make a reasonable extension of one of its terminal areas." *Ibid*, at 108. Indeed, express service has long been in competition, to some extent, with motor carriers. As the ICC has stated, "[e]xpress service and ordinary freight service, of course, have never been wholly noncompetitive. With changed conditions and the advent of REA's new management in 1959, competition between the services has been waged more vigorously and on a wider front. Nevertheless, that competition has been peripheral." Freight, All Kinds, L.C.L. Container Charges—U.S. A., 323 I.C.C. 468, 484. The ICC did not act arbitrarily in recognizing that competition was not necessarily the crucial factor in defining the terminal areas for REA. Whatever the competition involved, the ICC correctly found that REA performed a distinctive service unmatched by other carriers. Therefore, although REA may be increasingly engaging in competition with motor carriers, this does not mean that it has lost its "express" characteristics, *cf.* American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry., supra; American Trucking Ass'ns v. United States, 260 F.Supp. 386 (D.D.C.1966), aff'd. per curiam, 387 U.S. 93, 87 S.Ct. 1504, 18 L.Ed.2d 585 (1967); Freight, All Kinds, L.C.L. Con-tainer Charges—U.S.A., supra, at 483, at least at this time.

Last, we find that the ICC's decision does no injustice to the National Transportation Policy, which has as its basic tenets:

"* * * [T]o provide for fair and impartial regulation of all modes of transportation subject to the provisions of this act * * * so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices * * * all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the Commerce of the United States." 49 U.S.C. preceding § 1.

The ICC decision provides for fair and impartial regulation of REA by assuring uniform terminal areas regardless of the mode of line-haul movement employed. The shipping public, dependent on REA for the expeditious handling of small, often special, parcels, is protected by the ICC's ruling, as we have noted. Certainly, the National Transportation Policy is preserved by protection of the public. Moreover, the ICC, in effect, recognized the "inherent advantages" of express service by treating its terminal area limits in a different fashion from those under which motor carriers are bound. Also it is significant that the motor carriers evidence little interest in adopting REA's system of defining terminal areas by managerial discretion. "The motor carrier intervenors * * * have indicated their general satisfaction with MC–37 zones, because, *inter alia*, they know the geographical scope of their own and their competitors' service area." *Express*

*Company Terminal Areas*, supra, at 108. They do not seek to expand their terminal area limits but to reduce REA's zones. As the record shows, this might severely handicap the distinctive express nature of REA's service.

Plaintiffs are not left unprotected by the ICC's ruling, nor are they put at an unfair advantage. They may petition the ICC to undertake investigation and suspension proceedings as to any changes in REA's terminal areas they feel unreasonable, and, as interested parties, may file a complaint with the ICC, testing particular terminal areas. American Trucking Ass'ns v. United States, supra, 260 F.Supp. at 390. Moreover, motor carriers are buffered by the special restrictions imposed in REA motor carrier certificates, received under Part II of the Act. These restrictions recognize the express nature of REA's operations, by limiting its motor authority to service auxiliary to or supplemental of its express service, by requiring that shipments transported be limited to those moving on through bills of lading or express receipts, and by imposing other unique restrictions. *Nashua*, supra, at 329.

Plaintiffs contend that the National Transportation Policy, as well as § 5(2)(b) of the Act have been violated by the intrusion of the railroad owners of REA into a field of motor carrier service unrelated to their rail activities. However, the restrictions in REA's motor certificates, discussed above, protect against unwarranted intrusions. In addition, since REA's motor carrier service acts as a supplement to declining line-haul movement by rail, the extension of motor carrier service is related to the rail activities of REA's owners. *See Nashua*, supra, at 339–340.

Therefore, the National Transportation Policy, which the ICC used as its "lodestar" in this proceeding, *Express Company Terminal Areas*, supra, at 104, has not been breached.

■ For the reasons stated above, we DENY plaintiffs' action to suspend, annul and set aside the order of the ICC,

and hold that the ICC had a rational basis upon which to conclude that REA offered distinctive service meriting different terminal area treatment, than that received by ordinary motor carriers. Because of this conclusion, we find it unnecessary to decide if REA is governed under Part I or Part II of the Interstate Commerce Act as to its line-haul movement by motor vehicle. In either event, REA's distinctive service is sufficient to warrant different terminal area treatment.