**FREIGHT FORWARDERS INSTITUTE et al., Plaintiffs,**

v.

**UNITED STATES of America, INTERSTATE COMMERCE COMMISSION, et al., Defendants.**

No. 74 C 2311.

United States District Court, N. D. Illinois, E. D.

Feb. 27, 1976.

6. This figure reflects our deduction of the $3000 discussed in footnote 2 *supra.*

D. Robert Thomas, Henry A. Preston, Kirk B. Johnson, Sidley & Austin, Chicago, Ill., and Giles Morrow, New York City, for plaintiffs.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Dept. of Justice, Washington, D. C., James R. Thompson, Jr., U. S. Atty., Chicago, Ill., for defendant United States.

Fritz R. Kahn, Gen. Counsel, Hugh W. Cuthbertson, Washington, D. C., for defendant Interstate Commerce Commission.

Peter T. Beardsley, Nelson J. Cooney, Robert L. James, Washington, D. C., for intervening defendant American Trucking Associations, Inc.

R. Edwin Brady, Keith G. O'Brien, Roland Rice, Richard R. Sigmon, Washington, D. C., for intervening defendant Regular Common Carrier Conference of American Trucking Associations, Inc.

Francis W. McInerny, John Guandolo, Richard A. Mehley, Washington, D. C., for intervening defendant Local and Short Hall Carriers National Conference.

John W. Storer, McKenna, Storer, Rowe, White & Haskell, Chicago, Ill., Russell & Schureman, Los Angeles, Cal., for intervening defendants Brake Delivery Service, Meier Transfer Service, City Freight Lines, G & H Transportation, Inc., Griley Freightlines, Quickway Trucking Co., S & M Freight Lines and Smith Transportation Co.

Before PELL, Circuit Judge, and MAROVITZ and LYNCH, District Judges.

LYNCH, District Judge.

The plaintiffs have brought this suit to set aside the report and order of the Interstate Commerce Commission (here-

inafter Commission) in a proceeding identified as Ex Parte No. 266 (Sub-No. 1), *Investigation Into the Scope of Freight Forwarder Terminal Areas*, 343 I.C.C. 565. The end result of that proceeding was that the Commission refused to expand the terminal areas of the freight forwarders (hereinafter forwarders). It is the reasoning of the Commission's decision that the forwarders take umbrage with and which they use as a base for their attempt to have the Commission's order overturned. A review of the arguments of the opposing parties indicates a strenuous disagreement not only as to the specific issue of whether the Commission has the authority to expand the terminal areas but also a disagreement as to the specific grounds by which the Commission refused to do so. A review of the background of this litigation will aid in coming to grips with the issues this Court must decide.

I

BACKGROUND

The plaintiffs are individual freight forwarder companies and the Freight Forwarders Institute. The Institute is a voluntary association of freight forwarders. The forwarders are common carriers subject to regulation under Part IV of the Interstate Commerce Act (hereinafter the Act). 49 U.S.C. Section 1001 *et seq.* The basic activities of the forwarders in conducting their business were described by the Commission in its decision as follows:

> Freight forwarders assemble the shipments of many shippers or receivers and consolidate them into carload, truckload, or other volume quantities at so-called concentration points. They then ship this consolidated traffic by common carrier to the general vicinity of its ultimate destination, where the volume lots are broken down into individual shipments for delivery to the ultimate consignees. The forwarder makes its profit on the spread between the higher less-than-carload or less-than-truckload rate it charges its customers and the volume

rate it pays the underlying carrier performing the actual movement of the goods. (343 I.C.C. at 566)

The forwarders see to it that the less-than-carload and less-than-truckload shipments are brought to what is referred to as a "concentration" or "collection" point. This is where these smaller shipments are consolidated and prepared for a line-haul movement. The line-haul movement is performed, of necessity, by a carrier other than a forwarder. It may be performed by carriers subject to Part I of the Act (rail carriers), Part II (motor carriers), or Part III (water carriers). The line-haul movement terminates at the forwarder terminals that are relatively proximate to the location of the ultimate consignee of the shipment. This terminal is referred to as the break-bulk point. It is here that the consolidated shipments are broken down into their original, smaller, components and then distributed to their ultimate destinations.

The significance of any definition of the size of the forwarders' terminal areas is gleaned from Section 202(c) of the Act (49 U.S.C. Section 302(c) ). The import of Section 202(c) is that the forwarders may collect and deliver the smaller shipments within their own terminal areas through the use of their own equipment or by hiring a non-certificated carrier who is not regulated by the Act. However, if the consignor and/or consignee happen to be located outside the forwarders' terminal areas, the assembly and distribution services which must be performed prior and subsequent to the line-haul movement are not exempt from regulation under the Act. Consequently, the forwarders could not perform these services by themselves but must hire certificated carriers to perform them. This fact raises the possibility that the forwarders would have to purchase the services of an underlying mode of transportation not just once, for the major line-haul movements, but possibly up to three times if both the assembly and distribution services must be performed at points outside the terminal

areas. The ramifications of the latter situation are readily apparent. If the forwarders are required to hire certificated carriers twice or three times rather than once, their costs will rise and their profit margins are severely reduced.

## II

### THE PROCEEDINGS BEFORE THE COMMISSION

In a Notice of Proposed Rule Making filed by the Commission on May 13, 1971, it was noted that the Commission was embarking upon a proceeding to determine whether the territorial extent of the forwarders' terminal areas should be extended. The Commission noted that in a previous proceeding it had concluded that:

[T]he time had come to alter certain traditional concepts relative to this mode of transportation . . . It was also recognized that another way in which forwarding as a mode of transportation might be revitalized would be by a general expansion of the terminal areas within which they perform transfer, collection, or delivery services. (36 F.R. 8889)

The Commission noted that an expansion of the terminal areas might result in, " . . . improved services to the public with concomitant increases in forwarders' (and through them, railroads') participation in the transportation of small shipments traffic." The Commission stated that before it took any action in this area, it would undertake to notify interested parties so that they might file statements in favor of or in opposition to, the possible expansion with the Commission.

On June 27, 1973, after considering the various arguments proffered to it on the pertinent question, the Commission ruled that the forwarders' terminal areas could not and would not be expanded by order of the Commission. A thorough review of the Commission's decision is necessary in order to grasp the issues that this Court must now decide. This point must be emphasized due to the current dichotomy of opinion among the parties as to the reasoning of the Commission in reaching its decision.

### THE REPORT OF THE COMMISSION

The Commission noted early in its report that a previous decision of the Commission held that the terminal areas of forwarders should be essentially the same as the commercial zones of the municipalities in which the terminal areas are located. *Commercial Zones and Terminal Areas*, 54 M.C.C. 21 (1952). Section 203(b)(8) of the Act, 49 U.S.C. Section 303(b)(8), provides for an exemption from regulation under the Act of " . . . transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities . . ." The commercial zones are generally fixed by a population mileage formula.

Reference is made in the Commission's report to previous decisions of the Commission wherein the terminal areas of other types of carriers had been expanded considerably upon a finding that the service provided by the particular carrier had unique and important attributes which distinguished their services from other forms of transportation.

Having made the above observations, the Commission stated that "terminal area" is defined as that territory within which bona fide motor carrier collection, delivery, and transfer services may be performed by or for carriers otherwise subject to regulation under the Act. The Commission held that it was not the purpose of the proceeding to change this basic definition. The report stated:

Those who argue that we are without jurisdiction in this proceeding would be essentially correct if, as they contend, our action were to constitute such a redefinition of the terminal area exemption as would differ from the purpose of the statutory term as intended by the Congress. (343 I.C.C. at 578)

The report went on to indicate that the "statutory terminal area concept" was meant to refer solely to local transportation, i. e., *intracommunity* movement of traffic.

It contemplates the gathering or distributing of traffic *within a municipality* prior or subsequent to a line-haul or intercity movement. (343 I.C.C. at 579) (Emphasis added).

The Commission concluded that it lacked the authority to expand terminal areas to any location which would not be a part of a *single community*, the community which included the location of a particular terminal. If the Commission were to hold otherwise, transportation within the terminal area would become intercommunity in nature and the Commission held that it lacked the authority to allow such an expansion of terminal areas. The Commission found that Congress meant collection and delivery services to be inherently local in character and that this legislative intent must be respected.

After concluding that it was without jurisdiction to expand the terminal areas beyond their present limits, the Commission embarked upon a discussion concerning whether it should recommend legislative relief on this point. Before concluding that it would not make such a recommendation, the Commission stated:

In this type of proceeding, therefore, the issues of public need and the effect our action may have upon the involved carriers are not relevant considerations in deciding what action we may lawfully take on the present record without further legislation on the subject. (343 I.C.C. at 583)

Three vigorous and separate dissents from the Commission's majority report were filed. The dissent by Commissioner Brown evinced dismay with what he considered to be a conclusion reached after an auspicious beginning.

[I]n an attempt to preserve the status quo, (the report) emits a negative quality which is offensive to reasonable judgment. (343 I.C.C. at 588)

Commissioner Gresham's dissent noted the majority's seeming willingness to expand terminal areas upon a showing of distinctive features of a particular mode of transportation and then points out the distinctive aspects of freight forwarding.

Commissioner Gresham also refers to the Commission's failure to come to what he believes is an accurate definition of terminal area and points out that the Act left the definition of terminal areas to the Commission. In concluding, he points out that "municipality" and "intercity movement" have lost their meaning under current socio-economic conditions.

To restrict the terminal areas of freight forwarders to commercial zones designed for another mode of transportation, on the basis of political geography of uncertain relevance even to its original purpose is an exercise in logic that should have been left to the likes of Procrustes. (343 I.C.C. at 590)

Commissioner O'Neal's dissent concludes with the epithet:

[T]he report closes the door on any growth in this area. In so doing, it fails to make any accommodation for the changes that have taken place in the world in the last 20 years, and also ignores the benefit to the consumer of more competition among carriers. I think this is a serious error. (343 I.C.C. at 592)

## III

## THE PROCEEDINGS BEFORE THIS COURT

This cause of action was instituted by the plaintiffs in an attempt to overturn the report of the Commission discussed above. A proper resolution of this controversy requires close scrutiny of the respective positions of the parties in this proceeding.

### (A) THE FREIGHT FORWARDERS

The forwarders use as a foundation for their argument the assertion that the Commission decided in its report that it lacked jurisdiction under the Act to ex-

pand terminal areas beyond the confines of commercial zones as the zones are defined in Section 203(b)(8) of the Act. The forwarders maintain that this was a fundamental error and that the Commission has the authority to do so.

The forwarders point out that terminal areas are not defined in the Act and they argue that this absence of definition is an indication of a Congressional intent to leave the authority to formulate such a definition with the Commission.

Furthermore, the forwarders point out the findings in the report which refer to "intracommunity" movements of freight but argue that a section of the report conclusively shows that the Commission equated "single community" with commercial zone. This particular passage reads as follows:

A commercial zone is not established or created by this Commission, but already exists by reason of trade practices, the uses to which an area is put, and demographic, geographic, economic, and political considerations. Cf. Chicago, Ill., Commercial Zone Extension-Sag Area, 94 M.C.C. 568 (1964). In this type of proceeding, therefore, the issues of public need and the effect our action may have upon the involved carriers are not relevant considerations in deciding what action we may lawfully take on the present record without further legislation on the subject. (343 I.C.C. at 583)

The forwarders argue further that the Commissioner's report is in error because it is in contravention of the National Transportation Policy which is set out in Title 49 of the United States Code preceding Section 1 thereof. The main supportive theory for this argument is that the Commission held that:

[T]he issues of public need and the effect our action may have upon the involved carriers are not relevant considerations in deciding what action we may lawfully take on the present record without further legislation on the subject. (343 I.C.C. at 583)

The forwarders take the position that public need and the plight of the affected carriers are relevant considerations in determining the size of terminal areas and refer to several previous Commission decisions which took those issues into consideration when decisions were made to expand terminal areas beyond the commercial zones of certain municipalities.

(B) THE UNITED STATES and the INTERSTATE COMMERCE COMMISSION

The United States and the Commission have filed a joint brief with this Court seeking an affirmance of the Commission's report and to rebut the forwarders' attack upon said report. These defendants make several points in their defense of the report.

The first point, one which is stressed heavily, is that the Commission's report did *not* conclude that the Commission lacked the authority to expand terminal areas beyond the areas defined by a particular municipality's commercial zone. The Commission concedes that it has the jurisdiction to do so and states further that to the extent that the freight forwarders refer to previous decisions by the Commission which permitted such an expansion, the forwarders have created a non-existent issue. The defendants argue that the Commission refused to expand the terminal areas of forwarders because the areas which the forwarders sought to be included within their terminal areas were outside the limitations of the "statutory terminal area concept" that defendants argue is embodied in Section 202(c) of the Act.

The defendants admit that the Act contains no definition of terminal area. However, they assert that the passage of Section 202(c) by Congress in 1940 took into consideration previous decisions of the Commission and various courts which construed the movement of freight within a terminal area as being purely local in nature. In this vein, defendants emphasize the portions of the report which indicate that terminal areas can be only

so large as to encompass intracommunity movements of traffic. Defendants then point out that the Commission held that the forwarders failed to present sufficient evidence that the proposed expanded terminal areas constituted a single community. The Commission held that in the absence of such a showing or without new legislative promulgations on this point the Commission lacked jurisdiction to expand the terminal areas to the degree requested.

The defendants make two other major points. One is that the Commission held that the evidence presented by the forwarders failed to convince the Commission that the collection and delivery services of the forwarders were unique or peculiarly distinct from the services provided by other carriers. Although they stop short of an explicit statement, the Commission held by a corollary proposition that if the forwarders had been able to make such a showing, the Commission could have created an exception to the basic terminal area concept. (I.C.C. brief at 18)

Finally, the defendants assert that the decision of the Commission fully comports with the National Transportation Policy, *supra*. This assertion is supported by the argument that the Commission reached its decision in an effort to preserve the inherent advantages of the services provided by each type of carrier. This conclusion is based on the assertion that the Commission took into consideration the needs of the public and the impact the expanded terminal areas would have upon motor carriers regulated by Part II of the Act.

## (C) THE AMERICAN TRUCKING ASSOCIATIONS

Certain intervening defendants have filed a joint brief in opposition to the forwarders' position. This particular brief was filed by the American Trucking Associations, Inc., the Regular Common Carrier Conference of American Trucking Associations, Inc., and The Local and Short Haul Carriers National Conference. For purposes of brevity,

the Court shall refer to this brief as the ATA brief.

The ATA brief closely adheres to the position of the Commission and the United States as enunciated in their brief. The ATA argues that the Commission properly executed its duties in ruling that it could not expand the subject terminal areas to the limits sought by the forwarders. The ATA comments upon previous decisions of the Commission which allegedly support the findings of the Commission and the rationale for its conclusion which have been discussed previously.

The ATA brief also addresses itself to several additional points.

The ATA asserts that the Commission has not enfranchised any motor carrier monopoly. The Court is in agreement with this assertion and does not perceive any viable issue in this case relating to "monopolies."

The ATA also contends, as the government contended in its brief, that, contrary to the position of the forwarders, the National Transportation Policy mandates rather than disfavors the Commission's report and order now under consideration.

Finally, the ATA concludes that the Commission's findings will not prevent individual freight forwarders from petitioning the Commission for an expansion of their terminal areas if they can demonstrate a legitimate need for augmented collection and delivery services.

## (D) CITY FREIGHT LINES

The final brief filed in support of the Commission's report was filed jointly by intervening defendants City Freight Lines, Brake Delivery Service, Meier Transfer Service, G & H Transportation, Inc., Griley Freightlines, Quikway Trucking Co., S & M Freight Lines and Smith Transportation Co.

This brief is mainly composed of lengthy excerpts from the Commission's report. The main divergence of this brief from those of the other defendants is a statistical exposition and commen-

tary relating to the relative advantages of these defendants' services compared with those of the forwarders. These defendants also point out what they believe to be a sparsity of evidence produced by the forwarders in the proceeding before the Commission and assert that this lack of evidence supports the Commission's refusal to grant the requested expansion of the forwarder's terminal areas.

(E) EX PARTE NO. MC–37 (Sub No. 26)

■ It was brought to the attention of this Court at oral argument that the Commission has instituted a new proceeding which contemplates a possible modification of the present rules governing commercial zones and terminal areas. The notice of this proceeding indicates that several potential considerations in the new proceeding may relate to matters which are of concern to this Court in resolving the issues presented in this proceeding. This fact has raised the question as to whether the notice of this new proceeding would render the case at bar moot. The Court notes that the new proceeding may resolve some of the controversy generated by the cause at bar. Nonetheless, the instant case has presented significant issues which may recur, even after the new proceedings before the Commission, and the Court deems it necessary to treat those issues now for two major reasons. The first reason is to avoid the recurrence of the issues now presented to this Court and the vitiation of the possibility that those issues would repeatedly escape proper judicial review. Secondly, the Court feels that a decision on the merits of this case may provide some direction in the new proceeding before the Commission with the hope that such guidance may estop a repetition of this complex piece of litigation.

## IV

### THE CONCLUSIONS OF THE COMMISSION

A study of the Commission's report and order, as well as previous decisions of the Commission relating to the size of terminals areas and commercial zones, reveals a perplexing montage constructed through the use of seemingly interchangeable terms such as "intracity movement", "intracommunity movement", "local transportation", and "movement within a commercial zone." The strongly divergent positions of the parties as to the specific ground for the Commission's decision now under review appear to stem from the use of these various terms.

The forwarders have adopted the position that the Commission erroneously held that it lacked the authority to expand the limits of the terminal areas beyond the limits of commercial zones. In attempting to rebut the forwarders' argument, the government admits that the Commission has the power to expand the terminal areas beyond the limits of commercial zones but contends that it does not have the authority to expand the terminal areas beyond the "single communities" in which the forwarders' terminals are situated. The forwarders contend, in reply, that the Commission, in its report and order, has, for all intents and purposes, considered "commercial zones" and "communities" to be identical. Consequently, the forwarders assert that the Commission's order is invalid insofar as it links these two concepts due to the fact that the Commission does have the power to expand terminal areas beyond the limits of commercial zones.

The Commission has stated in its report:

In the third and sixth supplemental reports in *Commercial Zones and Terminal Areas,* 48 M.C.C. 418 (1948) and 54 M.C.C. 21 (1952), this Commission considered in substantial depth the nature of the terminal area exemption as it applies to both motor carriers and freight forwarders. Their age notwithstanding, we believe that the conclusions reached in those decisions were and are proper, that their rationale was and is sound and that they are largely determinative of the issues raised herein. (343 I.C.C. at 576)

In light of the above statement it is necessary to seek out in these previous decisions some indication as to whether the Commission has considered the areas defined by the terms "commercial zone" and "community" to be coincidental. The Commission stated in one of those reports:

Commercial zones of municipalities have been defined with a purpose to include in the zone of each municipality all places which are an integral part of the industrial, business, or residential community which bases on that municipality. If commercial zone limits mark the limits of the industrial, business, or residential community, then they also mark the limits of the area which can be served by bona fide collection and delivery service and beyond which any service takes on the character of a line-haul or inter-community service. (54 M.C.C. at 63)

&ast; &ast; &ast; &ast; &ast; &ast;

We conclude that the bona fide collection and delivery services of freight forwarders at each municipality served, whether it be a concentration or break-bulk point or some other origin or destination, *do not extend beyond the limits of the industrial, business, or residential community which bases upon that particular municipality, in other words, do not exceed the limits of the commercial zone of that municipality.* (54 M.C.C. at 74) (Emphasis added)

The immediately preceding quotation leads to the inevitable conclusion that in the past the Commission has equated "commercial zones" with the "industrial, business, or residential community." Furthermore, the Commission's reaffirmance in the decision under review of its belief in the validity of its pronouncements in the *Terminal Areas* case indicates that it still believes in the coincidence of the terms "commercial zones" and "communities". In light of the above observation, it is difficult to reconcile the two positions of the Commission, namely, that on the one hand it has the authority to expand terminal areas beyond the limits of commercial zones but, on the other hand, does not have the authority to expand them beyond the limits of the community. Due to its prior decisions equating the two terms, it would appear that an admission that it had the power to expand the size of terminal areas beyond the limits of one would act as an admission as to the other.

It would appear that the Commission is compelled to concede that it has the authority to expand the limits of terminal areas beyond the limits of commercial zones due to the frequency with which it has done so in the past. In light of prior decisions of the Commission to this effect, it is a perplexing task to determine why the Commission is straining to draw a distinction between communities and commercial zones in its arguments before this Court when such a distinction has apparently never been drawn before and, in fact, the two terms have been considered to be synonymous. It would appear that the attempt to draw a seemingly unique, if not artificial, distinction is made in an attempt to justify the unusual result reached in the Commission's order.

In light of the previous observations, this Court is of the opinion that the decision under review, when read in conjunction with the Commission's brief in this case and its 1952 decision in the *Terminal Areas* case, is an overly restrictive view of the Commission's authority. This Court, however, is compelled to delve further in an attempt to determine conclusively whether the Commission erred in rendering the decision under review.

## V

## THE COMMISSION'S AUTHORITY TO DEFINE TERMINAL AREAS

■ The Commission argues strenuously that its authority to expand terminal areas is limited to what it refers to as the "statutory concept" of terminal areas. The term "concept" is employed by the Commission when referring to terminal areas due to the fact that Con-

gress, when passing Section 202(c) refrained from defining terminal areas. Such an omission leads to consideration as to the motivation of Congress in failing to define this key term. The Commission has chosen to argue that it was the intent of Congress, in adopting the term, to incorporate in the new statutory term the meaning that said term had gained through prior usage in the trade. The Commission points out that prior to the passage of Section 202(c) the "terminal concept" related to *local* movement of traffic. A review of the Commission's argument in this respect and the cases cited in support thereof, leave little doubt that Congress intended the term "terminal area" to have the connotation of a logical geographical relationship between contiguous geographical areas. However, this Court perceives a motivation on the part of Congress in omitting to *specifically* define terminal areas that is different from that espoused in the government's brief. In this respect, the Court finds the following exerpt from the *Terminal Areas* decision to be significant:

> Section 204(a)(6) makes it the duty of the Commission "to administer, execute, and enforce all provisions" of part II of the act and "to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration."
>
> Admittedly, there is no provision of the act conferring "specific" authority to determine either individually or collectively the limits of the terminal areas mentioned in section 202(c), *but incontrovertibly and of necessity the duty "to administer," "to regulate," and "to make all necessary orders * * * and to prescribe rules and regulations" includes the power to determine, as need be, the territorial limits of the exemption provided by that section, in other words, the territorial limits of the carriers or freight forwarders terminal areas.* The very extent of the duty to administer and the duty to regulate depends upon and is limited by the scope of any exemption

from regulation for which the act provides. *Clearly we must have included in the power "to administer" the act and "to regulate" the power to determine the territorial scope of any partial exemption from regulation.*

\* \* \* \* \* \*

The action contemplated herein is necessary if the administration of section 202(c) is to be accomplished and *we have no doubt that in the furtherance of, and as an incident to our duty to administer section 202(c) of the act, we have ample authority* upon a proper record such as we have here *to make an appropriate finding subject to a provision for individual consideration of unusual cases, as to the limits of the terminal area of motor carriers and freight forwarders* insofar as pick-up and delivery service in such areas is rendered in behalf of such transportation agencies by motor carriers which, except for the exemption, would otherwise be subject to complete regulation and to give effect to such finding by an order of general application. Authority to do that which is necessary is implied in the imposition of the duty. (M.C.C. at pp. 52–53) (Emphasis added)

The Court considers the above excerpt to be of critical significance for two major reasons. First, the excerpt is an open and emphatic indication of the Commission's view of its authority to determine the territorial limits of terminal areas. There can be no doubt that the Commission has determined that it has the power to make such determinations. Secondly, the reference to its duty to "administer," "regulate" and "make all necessary orders" in relation to Section 202(c) is very significant in light of Congress' referred-to reluctance to specifically define terminal areas.

Although the Commission steadfastly argues that Congress intended to adopt a *specific* concept of terminal area based upon prior usage, the Commission appears to ignore one unique factor present in the case *sub judice.* That unique factor involves the uncommon regulatory scheme arranged by Congress regarding

interstate commerce matters. That scheme includes not only a regulatory statute, the Interstate Commerce Act, but also a formal governing body, the Commission, to administer, interpret, and otherwise deal with the Act. It is not beyond reason to believe that a plausible explanation for Congress' omission to define terminal area may have been based upon its expectation that the Commission would exercise its expertise and interpret the new section in future times with an eye toward prevailing conditions in the transportation market. Indeed, the absence of a definition strongly indicates a desire for a flexibility in approach that a board of experts such as the Commission could give through interpretation of the term as the transportation industry evolved.

There can be little doubt that Congress realized that the transportation industry was, and is, dynamic by nature and that the needs of the public and the capability of the various carriers to serve those needs would alter rapidly over ensuing years. In this regard, the Commission stated in *Express Company Terminal Areas,* Ex Parte No. 242, 332 I.C.C. 91 (1967) (hereinafter referred to as Express):

> We have recognized on numerous past occasions that transportation constantly faces new concepts and changing conditions. To meet the needs of this dynamic industry and to best serve the public we have consistently strived for flexibility. (332 I.C.C. at 107)

The flexibility which the Commission refers to above and which is still required today has, through the decision under review, undergone a process of petrifaction.

The Commission's predilection to adherence to past practice and usage of the term "terminal area" does not ring true when considering the Commission's previous statement in the Express case to the effect that:

> '[T]he gravamen of the positions taken by the various parties, both carriers and shippers, relates chronologically to the place in our present transportation

system of express service and pickup and delivery within terminal areas, rather than to an isolated and narrow technical or historical question. (332 I.C.C. at 104)

The above quote shows a commitment on the part of the Commission to resist being hampered by rigid adherence to past practice in dealing with current problems in the transportation system that require a progressive analysis in order to find proper solutions to those problems. The Commission's manifestation of atavistic tendencies in its report and order is particularly confounding in light of certain of its prior decisions.

In the *Express* case, the Commission faced a question similar to the one presented in the instant case. In *Express,* the Commission determined that express companies, principally REA, could conduct motor carrier operations beyond the limits of commercial zones. Significantly, the examiner who ruled on the *Express* case in the first instance ruled that such operations constituted the performance of line-haul movements—the same contention being advanced by the Commission in this case. Notwithstanding the Commission's position in the instant case, the Commission overturned the findings of the examiner in the *Express* case. Although the Commission emphasized the need for a reasonable geographical relationship between the points included within the terminal area, it did not hesitate to allow the express company to operate outside of commercial zones. The Commission cited such factors as the needs of the shipping public, the needs of a troubled express carrier system, and the distinctive nature of express service as being important considerations in reaching their decision.

Although the factual background in *Motor Transportation of Property Incidental to Air,* 112 M.C.C. 1 (1970), varies from this case, several pronouncements by the Commission in that case are applicable in the present situation. That case dealt with another exemption, one contained in Section 203(b)(7a) of the

Act, which is similar to the exemption contained in Section 202(c). The petitioners in the *Incidental* case sought a restriction of the then prevailing 203(b)(7a) exemption on the contention that certain areas within the exemption were outside homogeneous metropolitan communities. The Commission found that although there was evidence to sustain this contention it would retain the old lines of delimitation nonetheless. In doing so, the Commission relied heavily on the needs of the public. Of particular significance is the following passage from that decision.

> We recognize that this situation is an exception to our *policy,* enunciated herein, requiring single community homogeneity, but we believe that appropriate consideration must be given to such past practice upon which the shipping public has come to rely. (112 M.C.C. at 20) (Emphasis added)

Several important points can be gleaned from this pronouncement. The most significant point is that the Commission specifically stated that its requirement of single community homogeneity was *its policy* rather than an ironclad rule mandated by Congressional intent. Moreover, the Commission was not only willing to but did make an exception to its policy—something it has steadfastly refused to do in this case. This recent ruling takes on the visage of an odd apparition when compared with the instant case where the Commission refused to make an exception, not on a finding related to policy considerations such as public need or the status of the freight forwarding industry, but on a finding that it lacked the authority to do so.

These previous decisions of the Commission indicate that the decision under review, rather than closely following established precedent, has departed therefrom and has constructed a new theory restricting its authority which this Court deems to be less than persuasive.

An essential function of the Commission is to inject the regulation of our interstate commerce system with a degree of flexibility which is essential in this ever-evolving system. Strict adherence to a fast-fading concept of "single community homogeneity" in our present-day society made up of rapidly burgeoning urban centers will only serve to hamstring efforts to maintain the requisite flexibility. Factors such as industrial expansion and relocation in suburbs and outlying areas, quality of service to the public, and changing patterns of transportation resulting from the construction of modern expressways appear to be more significant considerations in developing a modern and healthy transportation system than adherence to talismanic concepts such as the "single homogeneous community" whose very existence may be highly exaggerated.

The above observations reinforce this Court's observation that the Commission erred when it held that it lacked the authority to expand the terminal areas of freight forwarders beyond the limits of single communities. There are other reasons mandating this finding.

## VI

## EXCEPTIONS TO THE "STATUTORY TERMINAL AREA CONCEPT"

The cases discussed above show that the Commission has been willing in the past to make exceptions to its terminal area "concept." An excerpt from the Commission's brief in this proceeding confirms this observation. The attorneys for the Commission and the United States in referring to the Commission's decision in this matter, state:

> Secondly, the Commission concluded that, based upon the scope of the forwarders' actual services, there was nothing to indicate that their collection and delivery services, when properly distinguished from their assembly and distribution services are unusual, distinct or any more extensive geographically than those of motor carriers. Thus, the Commission could not create an exception to the basic terminal area concept where none properly existed and could not treat freight for-

warders differently under the terminal area exemption than motor carriers. (Commission's brief at 18)

The corollary of the above rule is that if the forwarders could produce evidence that they provide a unique or distinctive service then the Commission could make an exception in their case. This position once again indicates that not even the Commission is convinced of its pronouncement in disavowing authority to define terminal areas other than as required by the ubiquitous "statutory concept." The Commission's position that it has the power to grant an exception to its general policy compels *a fortiori* the conclusion that the Commission is not so inextricably manacled as it would otherwise indicate.

## VII

## THE NATIONAL TRANSPORTATION POLICY

The National Transportation Policy, 49 U.S.C., preceding Sections 1, 301, 901, and 1001 of the Act provides:

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; —all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of commerce of the United States, of the

Postal Service, and of the national defense. All provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

The question of whether the Commission's decision in this case is consistent with the public interest and the National Transportation Policy (hereinafter NTP) is a point of vociferous disagreement between the parties. The Commission asserts that its report and order do comport with the NTP.

The Commission bases this argument upon the assertion that the Commission, in reaching its decision, considered the adverse impact upon motor carriers if it were to expand the terminal areas of the freight forwarders. A reading of the Commission's report, however, indicates that minimal reliance was placed upon the condition of the motor carriers vis-a-vis the freight forwarders in reaching the decision in question. Much greater reliance is placed upon the "statutory concept" of terminal areas than on any policy question, let alone the NTP.

Although the Commission adverted to policy considerations which compelled the conclusions it reached, the Commission gave short shrift to certain policy questions which would normally be paramount in importance. An indication of this is embodied in the Commission's report which states:

In this type of proceeding, therefore, the issues of public need and the effect our action may have upon the involved carriers are not relevant considerations in deciding what action we may lawfully take . . . (343 I.C.C. at 583)

The Commission reiterated this sentiment at 587:

. . . even if the effect of forwarders, other carriers, and the public in general of the proposed terminal area expansion were a proper consideration in this proceeding (which it is not) . . .

These quotations appear to contravene the Commission's earlier statement that

it was considering the adverse effect freight forwarder terminal area expansion might have on the motor carriers for they indicate explicitly that the effect on carriers is not a proper consideration in this case. Of even greater significance is the Commission's indication that public need is not a relevant consideration in this matter. This position completely contradicts earlier pronouncements of the Commission in cases involving similar issues.

In the *Express* case discussed above, the opponents of larger terminal areas argued that shippers needs were not a relevant factor in determining the scope of terminal areas. 332 I.C.C. at 96. Notwithstanding this argument, the Commission, in its decision to maintain the larger terminal areas, held that public dependence, another way of saying public need, was the most significant factor in its decision. 322 I.C.C. at 105. The Commission even went so far as to state that an important consideration was the adverse economic impact on REA if its terminal areas were confined to commercial zones.

The most telling points in this regard were made in the decision rendered by the three-judge court which affirmed the Commission's order in the *Express* case. That court stated quite forthrightly:

> The shipper is the person protected by the ICC ruling and by this court today, for he cares little about the mode of intercity transportation employed . . . . *Northern Freight Lines, Inc. v. United States,* 304 F.Supp. 536 (1969) at 543.

■ This Court is perplexed once again by the stark contrast that the decision under review provides with earlier pronouncements of the Commission. In this Court's opinion the National Transportation Policy dictates that the Commission must consider the needs of the public in general, the needs of shippers, and the impact any action it might take would have upon the effected carriers. The comments made earlier by the Court relating to the uniqueness of the Commission's role in the overall statutory scheme are equally applicable here. The Commission is the important arbiter of the statutory scheme established in the Act and, even more so, an interpreter of the broad and fundamental guidelines of the National Transportation Policy.

In attempting to preserve the decision of the Commission in this case, the ATA points out in its brief:

> Clearly it is not beyond the jurisdiction of the Commission to expand terminal areas where a legitimate need for augmented collection and delivery service exists. (ATA brief at 31)

This Court certainly considers this statement to be a verity and yet the Commission simply disregarded its basic import when it held that the public's needs were *not* a relevant consideration. The Commission's decision in this respect appears to be clearly erroneous. As the Court stated in the *Northern Freight Lines* case, *supra,* "Certainly, the National Transportation Policy is preserved by protection of the public." 304 F.Supp. at 544.

■ The Court finds that the Commission erred in holding that the needs of the public and the effect of the Commission's ruling on the effected carriers were not relevant considerations in its proceeding.

■ This Court is aware of the status of the law in regard to the limited scope of its review of an administrative rule-making proceeding. As the government brief is quick to point out, this Court is normally confined to an affirmance of the Commission's findings unless there is a clear showing of an abuse of discretion. It certainly is true that consideration of the weight and value of the evidence and the inferences to be drawn therefrom are matters for the Commission alone. *New England Divisions Case,* 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605 (1922). However, it is not a matter of discretion or the weight of the evidence that causes this Court to find fault with the Commission's findings. The Court considers the Commission to have erred in matters of law. The Court's

power of review is succinctly described in *American Trucking Associations v. United States,* 260 F.Supp. 386 (D.C.D.C. 1966) at 388 in the following manner:

> Accordingly, our function is to *ascertain whether the Commission has correctly applied the law* and, if so, whether its findings sufficiently indicate the bases for the conclusions reached, and whether the evidence contains substantial support for the findings. (Emphasis added)

■ This interpretation of the Court's scope of review indicates that the threshold determination to be made is whether the Commission correctly applied the law. Although the scope of the power of review is narrow, it still exists and if it appears to the Court that an error of law has been made this Court cannot shirk its duty to overturn the Commission's report and order if the Commission has not correctly applied the law. It is the Court's opinion that the Commission has erred in several critical respects and it is for this reason that the Court deems it necessary to exercise its power to overturn the Commission's report and order.

■ Finally, in remanding this case to the Commission, the Court does not wish to convey the impression that it no longer considers valid the notion that the geographical areas contained within a terminal area should have a logical geographic relationship to each other. Furthermore, as indicated previously, the Court does not reject the notion that the terminal area exemption is essentially meant to cover "local" movements of traffic. However, the Commission's ruling that it cannot expand terminal areas beyond the limits of what the Commission now considers to be a "single homogeneous community" fails to take into consideration several important factors. The Commission's approach leads to an iron-clad rule which fails to take onto consideration such phenomena as the modern trend toward industrial relocation in suburban and outlying areas. The modern expansion of the concept of "urban areas" or "greater metropolitan areas" due to the dramatic increases in population densities in areas not included in a particular municipality or even the municipalities adjacent to a base municipality is an important consideration in what might be considered "local" transportation.

Finally, the Court feels that the public's needs and the quality of service provided to it are critical and are the barometers which should offer guidance to the Commission in reaching its decisions. These are the major elements that militate strongly in favor of retaining the flexibility in Commission proceedings that is not present in the legislative process. The Commission should not lose sight of these matters and the Court has found no indication that Congress intended to restrict the Commission from retaining this desirable flexibility. Consequently, this Court is of the opinion that the Commission, in its decision now under review, has constructed an artificial barrier around itself that prohibits it from fully and freely exercising the authority that it should and does have.

## CONCLUSION

Based upon the preceding analysis, the Commission's report and order in this matter is set aside and the matter is remanded to the Commission for further proceedings in conformity with this decision.