602 F.2d 444
 195 U.S.App.D.C. 266
 AMERICAN TRUCKING ASSOCIATIONS, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Crete Carrier Corporation, Contract Carrier Conference,
Cargo Contract Carrier Corporation, Leaseway Transportation
Corporation, Whirlpool Corporation, Chromalloy American
Corporation, et al., Intervenors.
The ATCHISON, TOPEKA AND SANTA FE RAILROAD COMPANY, et al.,
Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Chromalloy American Corporation et al., Intervenors.
 Nos. 78-1407, 78-1717.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 3, 1979.
Decided June 26, 1979.
 
 Kenneth E. Siegel, Washington, D.C., with whom Nelson J. Cooney, Washington, D.C., was on the brief, for petitioner in No. 78-1407.
 James E. Sykes, Chicago, Ill., a member of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Robert G. Seaks, Washington, D.C., was on the brief, for petitioner in No. 78-1717.
 James P. Tuite, Atty., I.C.C., Washington, D.C., with whom Mark L. Evans, Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, I.C.C., John J. Powers, III, Asst. Chief, and Peter L. de la Cruz, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 
 
 1
 Daniel Joseph, Washington, D.C., with whom Randall Sarosdy and Edward F. Schiff, Washington, D.C., were on the brief, for intervenors Leaseway Transp. Corp. and Whirlpool Corp. in No. 78-1407.
 
 
 2
 E. Stephen Heisley and Lester R. Gutman, Washington, D.C., were on the brief for intervenor Chromalloy American Corp., et al. in Nos. 78-1407 and 78-1717.
 
 
 3
 Thomas A. Callaghan, Jr. and Rick A. Rude, Washington, D.C., were on the brief for intervenor Contract Carrier Conference, Inc. in No. 78-1407.
 
 
 4
 Robert J. Gallagher, Washington, D.C., was on the brief for intervenor Cargo Contract Carrier Corp. in No. 78-1407.
 
 
 5
 Rick A. Rude, Washington, D.C., also entered an appearance for intervenor Crete Carrier Corp. in No. 78-1407.
 
 
 6
 Before TAMM and WILKEY, Circuit Judges, and CORCORAN,* Senior District Judge for the United States District Court for the District of Columbia.
 
 
 7
 Opinion for the Court filed by CORCORAN, Senior District Judge.
 
 CORCORAN, Senior District Judge:
 
 8
 The petitioners[1] in these consolidated cases seek to set aside a final rule promulgated by the Interstate Commerce Commission (ICC or the Commission) on April 6, 1978, in a case styled Dual Operations, Ex Parte No. 55 (Sub. No. 27).
 
 
 9
 The petitioners contend (1) that the Commission lacked statutory power to adopt the rule, (2) that the Commission acted arbitrarily and capriciously in adopting the rule and (3) that the rule denies the petitioners due process in that it denies them a fair hearing before the Commission. Several intervenors[2] as well as the Department of Justice and the Department of Transportation support the Commission.
 
 
 10
 We find the rule to be procedurally and substantively reasonable and within the ICC's statutory authority to adopt. Accordingly we affirm the Commission.
 
 I. BACKGROUND
 A. The Statute
 
 11
 Under the Interstate Commerce Act, as amended by the Transportation Act of 1940, (the Act)[3] one may engage in the transportation by motor vehicle of passengers or property in interstate or foreign commerce either as a "common carrier" or a "contract carrier."
 
 
 12
 A common carrier holds itself out to the general public to perform for-hire transportation and operates under a certificate of public convenience and necessity. 49 U.S.C. § 303(14).[4] On the other hand, a contract carrier renders specialized transportation services pursuant to contracts with one customer or a limited number of customers and operates under permit from the Commission. 49 U.S.C. § 303(15).[5]
 
 
 13
 Section 210 of the Act, 49 U.S.C. § 310, is captioned "Dual Operation" and provides in pertinent part that no motor carrier may be granted authority to operate as both a common carrier and a contract carrier, i. e. to engage in dual operations, "(u)nless for good cause shown, the Commission shall find, or shall have found, that both a certificate and a permit may be so held consistently with the public interest and with the national transportation policy declared in this act. . . . "[6]
 
 
 14
 The subject of dual operations was first addressed by Section 7(c) of the so-called Rayburn Bill, H.R. 6836, 73rd Cong.2d Sess. (1934), which proposed that dual operations be totally prohibited. However, in passing the Act, Congress chose to abandon that total ban in favor of the present flexibility of Section 210, but gave little explanation for so doing. Indeed, the entire legislative history of Section 210 is contained in the remarks of Senator Wheeler, the Act's sponsor and Chairman of the Senate Committee on Interstate and Foreign Commerce, who observed:
 
 
 15
 This section (210) prohibits any person from holding at the same time a common carrier certificate and contract carrier permit, unless for good cause shown the Commission finds that both may be held consistently with the public interest and with the policy declared in Section 202(a). There are instances in which both types of operations can advantageously be conducted by the same operator and without prejudice to the public interest, but the possibility of abuses developing makes It advisable to give the Commission the power to pass on all cases in which it is proposed to combine the two types of operations. (emphasis supplied) 79 Cong.Rec. 5654 (1935).
 
 
 16
 B. The Administrative Interpretation of Section 210
 
 
 17
 In the years immediately following the passage of Section 210, the Commission granted applications for dual operations on a fairly routine basis.[7]
 
 
 18
 However, in 1940, in considering an application for dual operations in Canada Common Carrier Application, 26 M.C.C. 563, 565 (1940) the Commission concluded:
 
 
 19
 Clearly this (dual operations) cannot be done consistently with the public interest. Not only would it put applicant in a position to prefer by contract any shipper between points now authorized to be served while at the same time charging his full common-carrier rates to others, but equally objectionable, it would enable him by varying his contract-carrier charges to a particular shipper to grant, in effect, a rebate in his common-carrier charges between other points. We do not imply that any such practices would be indulged, but the mere possibility is enough to preclude the finding of consistency with the public interest required by Section 210. (emphasis supplied)
 
 
 20
 In Block Common Carrier Application, 49 M.C.C. 651, 654-655 (1949) the Commission articulated its rationale for adopting the "mere possibility of discrimination" standard:
 
 
 21
 In our administration of Section 210 of the act, we are charged with carrying out The clear and unmistakable intent of Congress to preclude the opportunity for discriminatory practices which might well result from the simultaneous holding, by two commonly controlled carriers, of both a certificate and a permit. Where the same shipper is or may be served in both capacities the door is open for objectionable practices even though the operations be wholly different. It is not necessary to point out the many and complex situations, involving substantial injustices to shippers and carriers, which are potentially present when a single carrier, or two commonly controlled carriers, are in a position to offer both common and contract-carrier services within the same territory. Neither is it necessary that we find the actual existence of such discrimination or even a probability thereof. We have consistently held that The mere possibility of discrimination warrants our refusal to relax the express prohibition contained in the statute. (Citations omitted) (emphasis supplied).
 
 
 22
 For a number of years, proceeding under the "mere possibility" test, the Commission remained wary of approving dual operations.[8]
 
 
 23
 However, by 1977, the Commission had altered its stance and specifically concluded in Delaware Express Co. v. Milford Express, Inc., 126 M.C.C. 462, 466 (1977) that "(t)he 'mere potential or opportunity' for discrimination standard is in our view overly restrictive and can in certain circumstances lead to seemingly absurb results." The Commission determined, accordingly, that in future cases it would require, as a reason for denial of dual operating permits, a showing (1) that there existed a likelihood that the applicant would serve the same party both as a common carrier and as a contract carrier and (2) that a Realistic possibility of discrimination would result from granting the application.[9] At the same time the Commission expressed its continued belief that "(t)he determination as to whether a realistic possibility of discrimination will result from a grant of dual operating authority should of course be made on a case-by-case basis." Delaware Express Co. at 467.
 
 C. The Staff Report
 
 24
 Against this backdrop of Commission precedent, the ICC staff issued a report in July, 1977, entitled "Improving Motor-Carrier Entry Regulation" which dealt with the efficacy of the existing regulations governing the licensing of motor carriers. The staff noted that the report had its genesis in the wide-spread feeling that more competition should be encouraged in the motor transportation industry and that the congested state of the Commission's motor carrier docket should be eased.
 
 
 25
 With specific reference to dual operations, the staff found that instances of rate discrimination practiced by carriers engaged in dual operations were virtually non-existent. It therefore recommended that the Commission issue, after appropriate administrative hearings, a general, prospective finding that the holding of dual authority was consistent with the public interest. The staff additionally recommended that the Commission seek the legislative repeal of Section 210.
 
 
 26
 The Commission issued a notice of proposed rule-making wherein it highlighted three factors which favored the staff's proposed general finding, Viz. (1) the presence of Section 218 of the Act, 49 U.S.C. § 318,[10] which gives the Commission disciplinary power over the rates and practices of motor carriers; (2) the desirability of reducing reliance on the entry control mechanism to ensure fair rate practices; and (3) a reduction in the administrative burden in light of the number of motor carrier applications filed annually.
 
 
 27
 The Commission solicited comments from interested parties, and received some 32 responses. The majority of the respondents supported the proposed rule. In particular, the Department of Transportation and the Department of Justice concurred in the staff conclusion that "past implementation of § 210 has resulted in protracted and expensive litigation, yielding inconsistent results, and revealing virtually no instances of discrimination or other abuse."[11]
 
 
 28
 The rule-making proceeding culminated in the issuance of the final rule contested here, which appears as subpart 1004.3 of Title 49 of the Code of Federal Regulations and reads as follows:
 
 Applications involving dual operations
 
 29
 When the Commission considers applications for motor carrier authority which involve dual operations, it is required by section 210 of the Interstate Commerce Act to find, or to have found, that it would be consistent with the public interest and the national transportation policy for the applicant to hold both common and contract carrier authority. The Commission has concluded that section 210 does not require an individual finding for each application, and it has issued a general finding, effective June 1, 1978, that the holding of both common and contract carrier authority normally is consistent with the public interest and the national transportation policy. Consequently, the Commission will not give individual consideration to this issue in applications involving dual operations, which are filed subsequent to June 1, 1978, unless there is a showing, in the particular case, that rate or service preference is likely to be extended or other discrimination is likely to be practiced. It will not be sufficient, in order to make such a showing, to establish only that dual service will be provided for the same shipper or consignee. Any grant of authority enabling dual operations will expressly reserve to the Commission the right to impose whatever terms, conditions, or limitations, may be necessary to ensure that applicant's operations conform to section 210 of the Act.
 
 II. THE MERITS
 A. Congressional Intent
 
 30
 The petitioners contend that the wording of Section 210 clearly charges the ICC with the responsibility of examining each application for dual operations on an individual basis to determine whether the application is consistent with the public interest and national transportation policy. In other words, the petitioners contend that the Commission is obliged to conduct adjudicatory hearings on each application coming before it and that by issuing the contested general, prospective finding of consistency, in the guise of an exercise of its rule-making power, the ICC has unilaterally removed the requirement of a case-by-case analysis, contrary to Congressional intent.
 
 
 31
 We assay the validity of the petitioners' arguments against the backdrop of the administrative scheme legislated by Congress for the regulation of the transportation industry. That scheme has been characterized as "uncommon" because it includes "not only a regulatory statute, the Interstate Commerce Act, but also a formal governing body, the Commission, to administer, interpret, and otherwise deal with the Act."[12]
 
 
 32
 In creating the ICC it was the "fond hope" of Congress that the Commission would "bring to . . . (its) work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess"[13] and that "the Commission would exercise its expertise and interpret . . . in future times with an eye toward prevailing conditions in the transportation market."[14]
 
 
 33
 It has long been recognized that flexibility and adaptability to changing needs are attributes which all administrative agencies should strive to achieve. The Supreme Court has observed that:
 
 
 34
 Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile changing economy. They are neither required nor supposed to regulate the present and future within the inflexible limits of yesterday.[15]
 
 
 35
 To determine whether the Commission has remained "within the limits of the law" as delimited by Section 210, we begin with the well settled principle that in construing statutory language we look first to the wording of the statute[16] and that such wording should be given its plain, obvious and rational meaning.
 
 
 36
 In our view the language of Section 210 clearly conveys the Congressional concern that motor carriers, operating under dual authority, might engage in various abuses, most notably rate discrimination. But it is just as clear that Congress delegated to the Commission the task of ensuring that such abuses do not arise. To that end we are persuaded that Congress intended by Section 210 to invest the ICC with broad discretion in the discharge of its delegated responsibilities. Conversely, we do not think that Congress intended to constrain the regulatory agency by prescribing rigid procedural rules.
 
 
 37
 Our views are not in conflict with the legislative history of Section 210, as embodied in Senator Wheeler's comments Supra. That history is silent as to the methodology to be employed by the Commission in its monitoring of dual operations, beyond the mere observation that the Commission possesses the power to review All cases involving such operations.
 
 
 38
 Additionally we must take into consideration the ICC's own construction of the statutory language of Section 210, and in that connection we should defer to the ICC's construction if it has a reasonable basis in law.[17] The history of the Commission's interpretation of Section 210 set out in part I.B., Supra, evidences, in our mind, the agency's continuing adaptation to the contemporary demands of the transportation industry. Rather than the claimed capricious departure from precedent, we find the agency's present interpretation and application of Section 210 to be reasonable and in accord with the intent of Congress.
 
 
 39
 Finally, we briefly address the propriety of the Commission's proceeding under its rule-making authority as opposed to its adjudicatory power. In so doing we bear in mind Judge Friendly's delineation of the relative merits of each procedure in WBEN, Inc. v. United States, 396 F.2d 601, 618 (2d Cir. 1968):
 
 
 40
 Adjudicatory hearings serve an important function when the agency bases its decision on the peculiar situation of individual parties who know more about this than anyone else. But when, as here, a new policy is based upon general characteristics of an industry, rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them. (citation omitted)[18]
 
 
 41
 In different settings regulatory agencies have been permitted to resort to rule-making in lieu of repetitive adjudication where general standards for an entire industry were under consideration.[19] Of particular note is the application of that principle by the three-judge district court in Chemical Leaman Tank Lines, Inc. v. United States, 368 F.Supp. 925 (D.Del.1973). In Leaman the petitioners challenged the ICC's power to issue a prospective finding of public convenience and necessity relating to the transportation of "waste products" pursuant to 49 U.S.C. § 304(a)(6). Relying principally on the language of 49 U.S.C. §§ 306 and 307,[20] the petitioners argued that the ICC was required to make an individual finding of convenience and necessity on each application for authority to transport waste products. The three-judge court rejected the argument stating:
 
 
 42
 The plaintiffs believe this language compels the Commission to test independently each application against the yardstick of public convenience and necessity. They would cast on the applicant the burden of proving that he satisfies this standard and forbid the Commission to ease his task by a prospective rule that specified types of service are deemed to serve the public interest.
 
 
 43
 The plaintiffs, we believe, read too much into Section 206(a)(1). The language of the section does not prescribe when the requisite 'finding' must occur. Nor does it prescribe an exclusive format for making that finding. Without such an unambiguous directive, we can see no reason why the Commission cannot make an advance classification of carriers, 'find' that the public convenience and necessity warrants operations by each carrier encompassed therein, and apply that 'finding' to those individual carriers who show they bear the common attributes of the class.
 
 
 44
 Similarly, we fail to find any language within Section 210 which prescribes a time when the requisite "finding" of consistency with the public interest must occur, or the method to be used in arriving at such a determination.
 
 
 45
 We recall Judge Leventhal's conclusion in American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App. 310, 315, 359 F.2d 624, 629 (1966) that:
 
 
 46
 rule making is a vital part of the administrative process, particularly adapted to and needful for sound evolution of policy in guiding the future development of industries subject to intensive administrative regulation in the public interest, and that such rule making is not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making.
 
 
 47
 We find no such clear Congressional requirement which dictates the procedure the Commission must use to implement Section 210. In its absence, we decline to thwart what we regard as the ICC's legitimate articulation of industry wide standards aimed at the maximum effectuation of Congressional objectives.
 
 B. The Arbitrary and Capricious Charge
 
 48
 The "arbitrary and capricious" standard requires a reviewing court to defer to an agency's judgment so long as it has a rational basis.[21]
 
 
 49
 We have previously listed in part I.C. Supra, the grounds expressly relied upon by the ICC to justify its prospective general finding. The two grounds of apparently greatest importance are (1) the finding by the ICC staff that rate discrimination as practiced by dual operators is virtually non-existent within the industry and (2) the staff conclusion that Section 218 of the Act provides a more effective method to monitor rate practices and abuses in the industry.
 
 
 50
 Those findings were echoed in the majority of comments of the parties responding to the Commission's rule making proceedings and the rational nexus between those findings and the Commission's actions has not been undermined by the petitioners' charges.
 
 
 51
 Nor do we think that the final rule represents a radical departure from the Commission's prior interpretation of Section 210. As we have previously observed, the ICC precedent in this matter reflects a flexible approach responsive to the dynamic changes occurring in the transportation industry. The factual findings of those decisions reveal a growing realization of the difficulties related to the Commission's strict application of Section 210, which the final rule attempts to remedy.
 
 C. The Procedural Due Process Charge
 
 52
 Lastly, the petitioners argue that the ICC's action will deny them procedural due process in future Commission hearings. They assert that the new rule improperly shifts to them the burden of proof in the agency hearing to show the undesirability of the proposed dual operations.
 
 
 53
 We disagree because we believe that, while the protestant will have the burden of producing some quantum of evidence as to the potential for abuse by the dual operator, the burden of proof will continue to remain with the applicant to demonstrate that the proposed dual operations will be consistent with the public interest. Thus, we do not agree that the protestants will be saddled with an insurmountable burden in proceedings under Section 210.
 
 III. CONCLUSION
 
 54
 For the reasons discussed above, the action of the Commission in promulgating subpart 1004.3 of Title 49 of the Code of Federal Regulations is
 
 
 55
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(c)
 
 
 [1]
 Petitioners are the American Trucking Associations, Inc. (ATA), a national organization of trucking firms; the Atchison, Topeka and Santa Fe Railway Company; and seventeen other western railroads
 
 
 [2]
 Intervenors are various companies engaged in motor vehicle transportation
 
 
 [3]
 49 U.S.C. § 1 Et seq. The Act has recently been revised and codified, without substantive change, and enacted as 49 U.S.C. § 10101 Et seq. by P.L. 95-473, 92 Stat. 1337 (1978). For convenience, discussion in the text reflects the language of the old provisions, with cross references to the new statute provided in the footnotes where appropriate
 
 
 [4]
 Now codified as 49 U.S.C. § 10102(11)
 
 
 [5]
 Now codified as 49 U.S.C. § 10102(12)
 
 
 [6]
 Revised Section 210, now 49 U.S.C. § 10930, reads
 Except when the Interstate Commerce Commission finds good cause consistent with the public interest and the transportation policy of section 10101 of this title . . .
 All parties seek comfort in the revised language, but we feel that no inference should be drawn from the change in language. This seems appropriate since the 1978 revisions were not intended to work any substantive change in the law. See P.L. 95-473, 92 Stat. 1466, § 3(a).
 
 
 [7]
 See Gittens Common Carrier Application, 4 M.C.C. 733 (1938); Salt Creek Transp. Co. Purchase Casey Truck Line Co., 5 M.C.C. 673 (1938); Luper Transp. Co. Contract Carrier Application, 6 M.C.C. 183 (1938); Wallace Common Carrier Application, 9 M.C.C. 451 (1938); Hale Extension Des Moines, Iowa Illinois, 12 M.C.C. 141 (1938); Barker Transp. Co. Purchase Patrykus, 5 M.C.C. 497 (1938); Schultz Purchase Hagen, 15 M.C.C. 13 (1938); Nelson Extensions of Operations, 1 M.C.C. 285 (1936)
 
 
 [8]
 Telischak Trucking Inc., Ext. Concrete Slabs And Beams, 92 M.C.C. 553 (1963); Southern Couriers, Inc., Ext. Commercial Papers, 94 M.C.C. 111 (1963); Wooten And Parker Ext. Petroleum, 86 M.C.C. 165 (1961); Lacasse Ext. Dairy Products, 79 M.C.C. 222 (1959); Indian Head Truck Line, Inc., Ext. Serv. Station Supplies, 81 M.C.C. 715 (1959); Complete Auto Transit, Inc., Ext. G. M. Willow Run Plant, 81 M.C.C. 455 (1959)
 
 
 [9]
 See Clarence L. Werner Ext. Ripon, WI, 129 M.C.C. 196 (1978); Southwest Equipment Rental, Inc., Ext. South Gate, 128 M.C.C. 731 (1978); Great Western Trucking Co., Inc., Ext. Columbus, 128 M.C.C. 721 (1978); Luisi Truck Lines, Inc., Ext. Eureka, Calif., 128 M.C.C. 760 (1978); Cargo Contract Carrier Corp. Ext. Bananas, 126 M.C.C. 874 (1977); Wayne Daniel Truck, Inc. Ext. Candy, 128 M.C.C. 1 (1977)
 
 
 [10]
 Now codified as 49 U.S.C. § 10704
 
 
 [11]
 See Comments of the United States Department of Transportation, Joint Appendix at 35 and Comments of the United States Department of Justice, Joint Appendix at 111
 
 
 [12]
 Freight Forwarders Inst. v. United States, I.C.C., 409 F.Supp. 693, 702-703 (N.D.Ill.1976)
 
 
 [13]
 American Trucking Assns. v. U. S., 344 U.S. 298, 310, 73 S.Ct. 307, 97 L.Ed. 337 (1952)
 
 
 [14]
 Freight Forwarders Inst., Supra note 12 at 703
 
 
 [15]
 American Trucking v. A., T. & S. F. R. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1966)
 
 
 [16]
 March v. United States, 165 U.S.App.D.C. 267, 506 F.2d 1306, 1313 (1974)
 
 
 [17]
 See Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)
 
 
 [18]
 See United States v. Florida East Coast R. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973)
 
 
 [19]
 Federal Power Comm'n v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956)
 
 
 [20]
 Section 306 forbids any motor carrier from operating in interstate commerce without a certificate of public convenience and necessity from the Commission. Before issuing such a certificate, Section 307 requires that the Commission find the applicant fit, willing, and able to perform the service proposed and the service itself to be required by present or future public convenience and necessity
 
 
 [21]
 Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 406-407 & n. 74, 541 F.2d 1, 34-35 & n. 74, Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)